## THE LIZZIE W. VIRDEN.

*(Circuit Court, E. D. New York. June 28, 1881.)*

1. CHARTER-PARTY.

The cargo in question was shipped under a charter-party, whereby the master engaged that in and during the voyage the vessel should be "well fitted," and "that he would take and receive on board all such lawful goods and merchandise" as the other party to the contract should think fit to ship. The cargo shipped was almonds in the shell, in sacks; out of the shell, in bags. The vessel on her outward trip had carried a cargo of petroleum, in barrels. Nothing was said in the charter-party about petroleum, but both parties knew when they signed the charter-party, before the outward voyage began, that she was loaded with such cargo. On the outward voyage petroleum leaked out from barrels in the hold and from barrels in the between-decks. The flavor and odor of petroleum were imparted to the almonds while they were in the vessel. The damage might have arisen from storing the almonds in contact with parts of the vessel containing petroleum, or with dunnage having petroleum in it or on it; or from the drip of the sweat of the hold, carrying the odor and flavor of petroleum with it. *Held:* (1) This damage did not arise from a peril of the sea; (2) the contract was to provide a vessel fit to carry such a cargo as was actually carried, and the vessel provided was one unfit for this purpose.

In Admiralty.

*Beebe; Wilcox & Hobbs,* for libellants.

*Benedict, Taft & Benedict,* for claimants.

BLATCHFORD, C. J. The cargo in question was shipped under a charter-party of the vessel to the libellants, whereby the master engaged that in and during the voyage the vessel should be "well fitted" "with every requisite" "for such a voyage," and that "he would take and receive on board the said vessel, during the aforesaid voyage, all such lawful goods and merchandise" as the libellants might think proper to ship. The charter was for a gross sum, and the libellants engaged to furnish "a full cargo of merchandise, or sufficient for ballast." The cargo shipped was almonds in the shell, in sacks; almonds out of the shell, in bags; filberts in sacks; capers in vinegar, in barrels; red wine in barrels; and salt in bulk. The charter-party provided that the master should sign bills of lading without prejudice to the charter-party. Three bills of lading were signed by the master for said cargo, each for a part of it. Bill No. 1 states that the master has received the goods on board the vessel "in good condition," and the master promises to deliver the goods "in the same condition," "and so to accomplish it" he binds the vessel "according to custom and the laws of commerce." Bills Nos. 2 and 3 state that the goods are shipped "in good order and well conditioned," and that they are "to be delivered in the like good order and well condi-

tioned." Bill No. 2 says that all dangers of the seas and navigation, "of whatever nature and kind soever," are excepted. Bill No. 3 says "the dangers of the seas only excepted."

The decree appealed from allowed to the libellants $1,512.22, and interest, for "the damages by them sustained by reason of the impregnation, during the voyage mentioned in the libel, of the almonds in said libel mentioned with the flavor and odor of petroleum." For such damage to 16,321 pounds of almonds out of the shell, in bags, three and one-half cents per pound were allowed, being $571.23; these being in bill of lading No. 3. For such damage to almonds in the shell, in bags and half bags, one and one-half cents per pound were allowed on 34,750 pounds, being $521.25; and one cent per pound on 20,474 pounds, being $204.74,—in all, $725.99; this being called the Nordlinger lot, and being in bills of lading Nos. 1 and 2. For such damage to almonds in the shell, in more or less of 750 bags, $215 was allowed; this being called the Dean & Hybeyer lot, and being in bill of lading No. 1.

The flavor and odor of petroleum were imparted to the almonds while they were in the vessel during the voyage covered by the charter-party and the bills of lading. The vessel, on her outward trip from the United States next preceding this voyage home, had carried a cargo of petroleum in barrels. Nothing was said in the charter-party about petroleum, but the libellants knew when they signed the charter-party at New York, before the outward voyage began, that the vessel was loading with a cargo of petroleum. So did the master, who signed the charter-party on the other part, and was part owner of the vessel. On the outward voyage, petroleum leaked out from barrels in the hold, and from barrels in the between-decks. There was no petroleum carried in the homeward cargo. The damage arose, therefore, from petroleum left in the vessel after the outward cargo had been unladen. It could have arisen from storing the almonds in contact with parts of the vessel containing petroleum, or with dunnage having petroleum in it or on it, or from the drip of the sweat of the hold, carrying the odor and flavor of petroleum,—the petroleum being in the wood forming the vessel, and the vapor of the petroleum being set free therefrom by the heat of the hold, and impregnating such sweat,—or from the setting free of such vapor by such heat, and the contact of such vapor with the almonds, or in two or more or all such ways. The effect of the contract between the parties was to except damage from perils of the sea. The question is

whether this damage was a peril of the sea. The burden in this case is on the owner of the vessel to establish the existence of facts to make out the exception. If the cause of the damage is shown to be an ordinary risk of navigation, after the exercise on the part of those in charge of the vessel of all reasonable precautions to prevent the injury, the negligence of the vessel is not made out, otherwise it is.

It is contended for the claimants that none of the almonds were damaged by coming in contact with any portions of the vessel which had been stained with petroleum; that during the voyage there was formed, by reason of the changes of temperature, a large quantity of steam and sweat in the hold of the vessel, which, settling on the beams, dropped on the bags of almonds, and thus damaged the almonds, because the heat of the hold caused the fumes and vapor of petroleum to exude from the wood forming the vessel, and they impregnated such steam and sweat, and thus the odor of petroleum was conveyed to the almonds; that those in charge of the vessel had, after unloading the cargo of petroleum, used proper care to cleanse the vessel from all petroleum which had got upon the wood forming the vessel before they received the almonds on board, so that the vessel, at the time the almonds were taken on board, was in a proper condition to receive them; that the damage from such steam and sweat, and thus from such impregnation of the almonds with the odor of petroleum, was a damage from a peril of the sea; and that as the libellants, before they put the cargo on board, knew that the vessel had just had on board a cargo of petroleum, the vessel is not liable for any damage which the almonds received from fumes or odor of petroleum resulting from heat of the hold during the voyage.

The district court did not determine by what method the taste and odor of petroleum were conveyed to the almonds, because it held that the liability of the vessel was the same whether petroleum in a fluid state or wood saturated with petroleum came in contact with the goods, or whether the vapor of petroleum, produced by the heat of the hold, caused the damage, either by tainting the sweat of the hold or by tainting the cargo directly. No allowance was made by the district court for damage by the steam or sweat of the hold, aside from petroleum damage, or for any injury by steam or sweat which did not convey petroleum. Allowance was made for only one kind of damage: that was petroleum damage, however conveyed, as long as it proceeded from the ship. Whether the steam and sweat resulting from heat or otherwise, and necessary incidents of a voyage at sea, existed or not, it is not a necessary incident of such steam or

sweat that it should be impregnated with petroleum. The heat may exist, and the steam and sweat may exist, and all be necessary accompaniments of the voyage; but if they are allowed to be vehicles of petroleum damage, the fact that the taste and odor of petroleum be conveyed by them does not make the damage therefrom a peril of the sea. The staining of the almonds by steam and sweat, or by sea water, was not allowed for.

It is contended for the claimants that the vessel is not liable, under the circumstances of this case, for the damage resulting from the fumes and odor of petroleum; that it is shown that the vessel was properly cleansed after discharging her cargo of petroleum; that all the petroleum there was left in the vessel was in the wood forming the vessel, and could not have been removed without destroying the vessel entirely; that after a vessel which has carried petroleum has been as thoroughly cleansed by external cleansing as possible, heat will bring out of the wood the fumes of petroleum which will taint the sweat of the hold; that petroleum being a lawful cargo, a vessel which has carried it is not liable for the result if her hold heats up, and if the fumes of petroleum evolved thereby cause damage to cargo, and that if the shipper of such cargo knows that the vessel has carried petroleum, he takes the risk of such damage on himself.

In answer to any theoretical evidence in this case, that cargo like this must be damaged if carried in a vessel which has previously had in her a cargo of petroleum which has leaked, provided there is heat and sweat in the hold, there is the practical evidence that vessels carrying petroleum out do bring home, without damage, cargoes of almonds. The risk is not on the shipper. If the petroleum leaks out, and if the wood forming the vessel will absorb it, then, as heat and sweat in the hold are necessary incidents of a sea voyage, the ship-owner must protect himself, by proper provisions, if he does not wish to be liable for damage caused by the liberation of the fumes of petroleum by the heat of the hold. His contract, in this case, was to provide a vessel fit to carry this cargo. She was not fit. The shipper took no risk but the perils of the sea, and the damage in that case was not a peril of the sea. I see no reason for disturbing the decision below as to the amount of damages. The ruling in *The Eroe*, 17 Blatchf. 16, on the subject of a rebate of duties, must be adhered to until it is reversed by superior authority.

There must be a decree for the libellants for $1,512.22, with interest from the date of filing the libel, and for their costs in the district court, taxed at $329.06, and for their costs in this court, to be taxed.